J-S42022-24                    2025 PA Super 65

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| TIMOTHY GIBSON | : | |
| Appellant | : | No. 565 MDA 2024 |

Appeal from the Judgment of Sentence Entered March 20, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0005480-2021

BEFORE: LAZARUS, P.J., BECK, J., and BENDER, P.J.E.

OPINION BY BECK, J.:                    **FILED: MARCH 19, 2025**

Timothy Gibson ("Gibson") appeals from the judgment of sentence entered by the Dauphin County Court of Common Pleas ("trial court") following his convictions of possession of a controlled substance, obstructing the administration of law, and possession of drug paraphernalia. His sole issue on appeal challenges the order denying his motion to suppress. We conclude that the probation officers had the authority to stop and frisk Gibson, but lacked reasonable suspicion to suspect that criminal activity was afoot and that the safety concern did not justify the forcible seizure that occurred. We therefore vacate Gibson's judgment of sentence.

The record reflects that on November 23, 2021, Dauphin County Probation and Parole Officer Bruce Cutter conducted a scheduled residential check of one of his supervisees, Scott Gibson ("Scott"). Scott's mother let Officer Cutter and his partner, Officer Jacobbi Harper, inside. Officer Cutter

then asked Scott "if there was anybody else in the house," to which Scott responded, "no." N.T., 5/4/2023, at 5. Scott escorted Officer Cutter down the hallway toward Scott's bedroom. *Id.* When Scott "open[ed] the doorway" Officer Cutter observed "another male individual, who was later identified as [Gibson], standing inside the doorway." *Id.*[1]

Scott informed Gibson that Officer Cutter needed to search the bedroom. In response, according to Officer Cutter, Gibson "turn[ed], kind of move[d] his body away, move[d] his arms in a furtive movement towards the front of his pant." *Id.* at 5-6. Officer Cutter testified that he was concerned by this behavior, as "anybody could be concealing anything, drugs, weapons, specifically weapons [] was my concern at that point." *Id.* at 7. After observing these movements, "they open[ed] the door, and [Gibson] begins to walk out of the bedroom." *Id.* at 6. Officer Cutter "kind of tried to stop him," and asked Gibson, "What's going on? What you are [sic] doing here, all this kind of stuff." *Id.* Gibson did not reply and "proceed[ed] to push past [Officer Cutter] in the hallway and attempted to walk back out towards the living room." *Id.*

---

[1] At the hearing on the suppression motion, the parties did not establish what relationship, if any, Gibson has to Scott and whether Gibson lived in the residence. According to the affidavit of probable cause prepared by Officer Harper, "Gibson does live in the residence." Affidavit of Probable Cause, 11/23/2021, at 5.

Officer Cutter "continued to follow" Gibson, "asked for identification, and told him he needed to have a seat in the living room." *Id.* Gibson "sa[id] he wasn't going to have a seat and attempted to make his way towards the bathroom," which was "kind of at the entrance of the hallway off to the living room." *Id.* Officer Cutter was "kind of standing in between him and the bathroom at that point." *Id.* Officer Cutter "told [Gibson] he wasn't going to the bathroom." *Id.* Gibson ignored Officer Cutter and "started making his way towards the bathroom," and in the process "began to move his hands towards his waistband, towards the front of his pants." *Id.* Officer Cutter "grabbed a hold of both of his wrists and told him he was not going to [the] bathroom, he was not free to leave, and he needed to have a seat in the living room." *Id.* Gibson "decided he was going to start fighting" and "at that point, Officer Harper jumped in" and the two arrested Gibson. *Id.* at 7. Officer Cutter saw a folding knife sticking out of Gibson's pocket, which he seized. *Id.* Upon a search incident to arrest, the officers located two baggies, which collectively contained thirty-one individual packets of cocaine. *Id.* at 15.

Gibson filed a motion to suppress, arguing first that probation officers do not have statutory authority over individuals like himself who are not under supervision. Therefore, there was no basis to seize him. Motion to Suppress, 12/30/2022, at unnumbered 3. Alternatively, Gibson argued that Officer Cutter had "ceased to act as an administrator of the parole system and began

- 3 -

acting as a police officer attempting to gather evidence" when he seized Gibson.[2] *Id.* at 4.

The trial court held a hearing on the motion, at which Officer Cutter testified as set forth above. Gibson argued both claims raised in his suppression motion. According to Gibson, "It was Scott Gibson who was under ... supervision. And probation officers cannot switch hats acting as police officers to gather new evidence of new charges." N.T., 5/4/2023, at 18. He further argued that the "furtive movements" Officer Cutter observed did not justify "detain[ing] [Gibson] to investigate further." *Id.* In response, the trial court cited officer safety, stating, "We're now into the securing the premises to make sure he can do the search safely. And he sees what appears to be furtive movements, and he's trying to make sure he's not at risk, correct?" *Id.* at 19. Gibson replied, "Your Honor, in order to detain him to do that, there must be reasonable and articulable suspicion that my client is armed and dangerous." *Id.* at 20. The trial court took the matter under advisement and issued an order and opinion denying suppression.

---

[2] Gibson did not cite a specific constitutional basis for his claim, but in context, based upon the authority he cited, he raised his challenges under the Fourth Amendment to the United States Constitution. *See* Motion to Suppress, 12/30/2022, at unnumbered 3. He did not, however, raise any claim under Article I, Section 8 of the Pennsylvania Constitution. *See Commonwealth v. Wolfel*, 233 A.3d 784, 790 (Pa. 2020) ("[W]e … reject the … premise that this Court should apply principles arising under Article 1, Section 8 to claims predicated solely on the Fourth Amendment to the United States Constitution.").

In its opinion, the trial court indirectly cited **Commonwealth v. Mathis**, 173 A.3d 699 (Pa. 2017),[3] for the proposition that parole agents, while lacking statutory authority to detain individuals who are not subject to their supervision, may constitutionally do so as a matter of ancillary authority on the basis that officer safety concerns equally apply when non-supervisees (like Gibson) are present. The trial court reasoned that the same analysis should apply to county probation officers.

Next, again relying on **Mathis**, the court determined that Gibson was lawfully detained because Officer Cutter "possessed the requisite reasonable suspicion to conduct a pat down of [Gibson]." Trial Court Opinion, 6/1/2023, at 5.[4] To support its conclusion that Officer Cutter had reasonable suspicion that Gibson was armed and dangerous as to justify a pat down, the trial court cited the fact that Officer Cutter "was not initially aware" that Gibson was present, and that Gibson "moved his body away and made furtive movements with his hands" when Officer Cutter first saw him. **Id.** "[U]nder the circumstances, a reasonabl[y] prudent officer would believe that the safety of himself and/or of others was in danger." **Id.**

---

[3] The trial court cited this Court's decision in **Mathis**, which was subsequently affirmed on appeal by our Supreme Court.

[4] The trial court incorporated and adopted this opinion in its Pa.R.A.P. 1925(a) opinion filed June 14, 2024.

Gibson proceeded to a bench trial on March 20, 2024, and was found guilty of all charges. He timely filed a notice of appeal and now raises the following issue: "Whether the [trial court] erred when it denied [] Gibson's motion to suppress, when probation officers had no valid basis or authority to detain or search [] Gibson?" Gibson's Brief at 5.

Before this Court, Gibson effectively concedes that the **Mathis** decision extends to county probation officers. Gibson's Brief at 17 (stating that "the legal analysis is likely the same for both county and state parole agents"). He emphasizes, though, that **Mathis** involved agents who established reasonable suspicion that the non-supervisee was engaged in criminal behavior and that the agents were legitimately concerned for their safety. **Id.** at 16. He submits that both are lacking here.

Beginning with a reasonable suspicion of criminal behavior, Gibson argues that the trial court "place[d] the moment of unconstitutional seizure at an erroneous time." **Id.** at 18. He avers that he was seized as he left the bedroom, citing Officer Cutter's testimony that he "kind of tried to *stop him*." **Id.** (quoting transcript; emphasis supplied). Therefore, the trial court erred by "mak[ing] much of … Gibson's noncompliance" with orders following his exit. **Id.** According to Gibson, his failure to follow those orders cannot be considered since he was already seized, and he maintains that there were no facts to justify any inference that he was engaged in criminal activity, as the only facts cited by Officer Cutter were "[Gibson]'s presence in the home, his

- 6 -

walking away, and his movements turning his body away from [Officer Cutter] and not being able to see … Gibson's hands." *Id.* at 19.

As to the first of these facts, Gibson "would have no knowledge" that Scott misinformed the agents. *Id.* In any event, he contends the agents had no authority over Gibson and he "was free to leave, ignore, or be as curt as he wished" to the agents. *Id.* Nothing about his presence signaled criminal activity. *Id.* at 20.

Regarding his furtive movements and turning his back towards Officer Cutter, he cites cases holding that furtive movements and nervous behavior, standing alone, do not give rise to a reasonable suspicion of criminal activity. *Id.* at 21-22. Relatedly, he reiterates that any such behavior after the seizure is not relevant. *Id.* at 22.

Gibson next argues that even if there was reasonable suspicion of criminal activity, the trial court erred in finding that Officer Cutter articulated sufficient facts to establish a reasonable suspicion that Gibson was armed and dangerous to justify a pat down. Gibson argues that, unlike the agents in *Mathis*, Officer Cutter here did not clearly identify a bulge as being any kind of weapon. *Id.* (citing Officer Cutter's testimony that "anybody could be concealing anything, drugs, weapons, specifically weapons, was my main concern at that point"). He argues that Officer Cutter lacked "any actual

particular belief that this bulge *was a weapon*[.]" ***Id.*** at 23 (emphasis in original).[5]

In sum, Gibson reiterates that under ***Mathis***, there must be both reasonable suspicion that criminal activity was afoot and reasonable suspicion that Gibson was armed and dangerous. On that point, Gibson notes that the ***Mathis*** Court "left unanswered the question as to whether there must be suspicion of both criminality and officer safety." ***Id.*** at 24 n.8 (emphasis omitted). Under the ***Mathis*** holding, however, both must be present. He argues that the trial court legally erred in finding otherwise.

Our review of the scope of authority of a member of law enforcement is a pure question of law, for which our standard of review is de novo and our scope of review is plenary. ***Mathis***, 173 A.3d at 706 (citation omitted). For a challenge to the existence of reasonable suspicion to support the actions of law enforcement, "we defer to the suppression court's findings of fact as supported by the suppression hearing record, which we assess in the light most favorable to the Commonwealth as the prevailing party. However, we review any legal conclusions de novo." ***Id.*** (citations omitted).

**Authority of Probation Officers as to Third Parties**

---

[5] We note that Officer Cutter did not testify to seeing a bulge, and Gibson argued the same at the suppression hearing. ***See*** N.T., 5/4/2023, at 20 ("[F]urtive movement is not enough. He's simply turning his back. There's no testimony to a bulge.").

We begin by addressing what, if any, authority Officer Cutter had over Gibson. Our Supreme Court has generally held that that the exclusionary rule applies where an individual, who lacks clear statutory authority to enforce the law, acts under the color of state authority. *See, e.g., Kopko v. Miller*, 892 A.2d 766, 770 (Pa. 2006) (holding that sheriffs lacked statutory authority to perform wiretaps under the Wiretapping Act; "[i]t is incumbent on the legislature to specify that ... [s]heriffs are encompassed within the definition of 'investigative or law enforcement officers,' in order to reach a different conclusion"). In such cases, "the requisite relationship between [accused] and the state ... exists so as to invoke the protections of the Fourth Amendment." *Commonwealth v. Price*, 672 A.2d 280, 284 (Pa. 1996). "The remedy of exclusion under such facts is not invoked as a means of punishing the state, but rather as a means of assuring that a defendant's constitutional rights are adequately protected when infringed upon by the use of unlawful state action." *Id.*

It is undisputed that Officer Cutter had no statutory basis to supervise Gibson. Nonetheless, we find that the rationale of *Mathis* extends to probation agents. In *Mathis*, Pennsylvania Board of Probation and Parole agents Michael Welsh and Gregory Bruner conducted a routine home visit of Gary Waters, a parolee. *Mathis*, 173 A.3d at 702. Waters invited the agents in, at which point they immediately smelled marijuana. As the three men walked through the home, the agents observed Mathis sitting in a chair in the

kitchen area. *Id.* The agents realized that Walters, who was a barber, had been giving Mathis a haircut. *Id.* One of the agents detained Walters, questioning him about the marijuana. Meanwhile, the other agent continued to watch Mathis, who "repeatedly got up from the chair and walked to the kitchen counter, apparently checking text messages on his charging cellphone." *Id.* Mathis appeared nervous, and the agents asked him to refrain from using the cellphone for safety reasons. *Id.* Agent Welsh testified that he then asked Mathis to grab his things "and come to the front room." *Id.* at 703.

Mathis began collecting his things from the kitchen. Agent Welsh noticed that Mathis gently placed his hands underneath his jacket "like it was ... a baby." *Id.* (quoting testimony). As Mathis began walking, Agent Welsh observed a bulge in the jacket. *Id.* At this point, Agent Welsh became concerned for the agents' safety and "asked [Mathis] if he could pat him down for safety reasons[.]" *Id.* Mathis refused, and Agent Welsh reached out and felt the bulge. Believing it to be a firearm, he forcibly pulled the jacket and threw it to the ground. The agents uncovered a firearm and Mathis was arrested. *Id.*

On appeal, our Supreme Court first looked to the sources of statutory authority over parolees. "[T]he Parole Code imposes a number of duties upon agents, including supervision of offenders in a manner that will assist in their 'rehabilitation and reassimilation into the community and ... protect the

public.'" *Id.* at 708 (quoting 61 Pa.C.S. § 6153(a)).[6] The Parole Code also "declares agents to be peace officers and provides them with police power to arrest without warrant any parolee under supervision for violating parole conditions." *Id.* at 701-02 (quoting 61 Pa.C.S. § 6152).[7]

The *Mathis* Court agreed "that the plain language … does not otherwise reveal a legislative intent to empower parole agents to act as police officers with respect to non-offenders or private citizens." *Id*. at 708 (quotation marks and citation omitted). It nonetheless authorized parole agents "to undertake constitutionally permissive actions that may preempt resort to the use of deadly force." *Id.* at 710. This was described as "ancillary authority" flowing from the statutory directive to supervise offenders and assist in their rehabilitation; "in order to satisfy these statutory duties, parole agents, among other things, conduct routine, unannounced home visits, as in this case, thus risking exposure to a variety of potentially dangerous unknowns." *Id.* at 708. The Court added that parole agents "are statutorily empowered to employ deadly force for self-protection or protection of another and in the course of making an arrest," and "are sanctioned to carry firearms in performing their duties." *Id.* It would be "anomalous to hold that parole officers may carry weapons like peace officers, place themselves in peril like peace officers, and

---

[6] That statute was repealed in 2021 and is now codified at 61 Pa.C.S. § 6182.

[7] This statute is now codified at 61 Pa.C.S. § 6181.

conduct lawful arrests like peace officers, yet not protect themselves in the face of apparent danger." *Id.* at 710 (citation omitted).

Examining the *Mathis* Court's rationale as applied to probation officers, we observe that the General Assembly treats county probation officers virtually the same as state parole agents in terms of statutory authorization over supervisees. Like parole officers, probation officers are charged with assisting offenders with their rehabilitation, reassimilation into the community, as well as protecting the public. *See* 42 Pa.C.S. § 9912(a) Probation officers further "shall have police powers and authority throughout this Commonwealth to arrest, with or without warrant, writ, rule or process, any person on probation … for failing to report as required by the terms of that person's probation … or for any other violation of that person's probation[.]" *Id.* § 9913. The General Assembly has also authorized probation officers to carry firearms, creating a mandatory firearms training program for those who carry a firearm. 61 Pa.C.S. § 6306. Moreover, in discharging their duties, probation agents, like parole officers, will inevitably encounter ordinary citizens, as occurred here. *See Mathis*, 173 A.3d at 709 (noting that "interactions with non-offenders are inherent in parole enforcement activities").

Based upon the similarity of the statutory sources governing their supervisory duties as well as the statutory authority granted to them to arrest their supervisees and carry firearms, and the concomitant safety risks that

may arise in the course of discharging those duties, we conclude that the *Mathis* holding extends to probation agents. Officer Cutter therefore had the authority to detain Gibson.

**Reasonable Suspicion of Criminal Activity**

Having determined that Officer Cutter had ancillary authority to detain Gibson in the course of supervising Scott, the next question is whether the authority he exercised was constitutionally permissible. The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures. "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime[;] … whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). *Terry* marked an important step in Fourth Amendment law. "Before *Terry* … the Fourth Amendment's guarantee against unreasonable seizures of persons was analyzed in terms of arrest, probable cause for arrest, and warrants based on such probable cause." *Dunaway v. New York*, 442 U.S. 200, 207–08 (1979).

The *Terry* decision authorized a seizure on less than probable cause, recognizing that officers must often take "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Terry*, 392 U.S. at 20. The Court thus looked to

- 13 -

"the Fourth Amendment's general proscription against unreasonable searches and seizure[s]" to strike a balance between promoting effective law enforcement and the liberty interests of citizens who are subject to detentions. *Id.* at 22. Most pertinent for present purposes is the Court's recognition that during some investigations the officer may have a need to protect his or her safety.

> [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Id.* at 24.

The Court thus authorized a frisk, which is a "limited search … not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence[.]" *Adams v. Williams*, 407 U.S. 143, 146 (1972). Critically, the authority to conduct a *Terry* frisk is, in the usual case, implicated only when there is individualized suspicion with respect to the individual who is validly seized. *See Commonwealth v. Hicks*, 208 A.3d 916, 933 (Pa. 2019) ("[A] reasonable belief that a suspect is armed and dangerous allows for a limited search for weapons only *after* the police officer ascertains specific and articulable facts to support a finding of reasonable suspicion that criminal activity is afoot.") (emphasis in original). *See also*

- 14 -

*Florida v. J.L.*, 529 U.S. 266, 274 (2000) (recognizing "a police officer's prerogative, in accord with *Terry*, to conduct a protective search of a person who has already been legitimately stopped"). As such, a police officer may not detain an individual who he or she reasonably suspects of being armed and dangerous unless the officer **also** reasonably suspects that criminal activity is afoot.

The *Mathis* decision offers a natural application of these principles. In *Mathis*, the Court concluded that the investigative detention was permissible because, "the agent possessed reasonable suspicion of both danger and criminality[.]" *Id.* at 715. As previously set forth, Mathis, like Gibson, was a third party who happened to be onsite when parole agents arrived to meet with a supervisee. Those state actors had no direct authority over Mathis and he was entitled to leave the premises. However, Mathis did not do so, and the Court determined that Mathis was "not detained until Agent Welsh reached out and seized the jacket." *Mathis*, 173 A.3d at 713.

The Court concluded that the "underlying facts establish[ed] reasonable suspicion that [Mathis] posed a danger to the officers." *Id.* "Most notably, [Mathis] displayed nervous behavior and speech, and the agent observed him carefully cradling a jacket containing a prominent bulge approximately the size, and potential shape, of a handgun." *Id.* at 713-14. He also "angled himself in a manner calculated to conceal the jacket from the agent." *Id.*

Additionally, in a footnote, the Court addressed the reasonable suspicion of criminal activity to detain, stating:

> To the extent [Mathis] argues that a **Terry** frisk in this context also requires reasonable suspicion that the subject is engaged in criminality, such suspicion was present in this case. By the time of the seizure, the agent had developed individualized reasonable suspicion that [Mathis] may be harboring contraband related to the evidence of recent marijuana use and/or a weapon."

**Id.** at 715 n.13.

Thus, as in **Mathis**, the Commonwealth first had to establish that Officer Cutter possessed a reasonable suspicion that Gibson was engaged in criminal activity to justify a seizure. Gibson posits there was no such suspicion, as "[f]urtive movements alone, even when combined with nervousness, do not constitute reasonable suspicion." **Id.** at 18 (citing **Commonwealth v. Reppert**, 814 A.2d 1196, 1199 (Pa. Super. 2002)). He argues that Agent Cutter failed to "identify specific and articulable facts that criminality is afoot and have a legitimate fear for officer safety." **Id.** at 15.

The Commonwealth contends that under the totality of the circumstances test the seizure and "frisk"[8] were lawful.

> The totality of these circumstances, [Gibson]'s presence not being disclosed, the furtive movements towards the front of his pants, and failure to comply with [Officer] Cutter's orders gave the officer reasonable suspicion that [Gibson] was concealing contraband,

---

[8] Both the Commonwealth and the trial court refer to this case as involving a pat down for weapons. Gibson responds to the trial court's suppression ruling, addressing whether the officer had reasonable suspicion to conduct a frisk. As discussed in detail below, this contention is not supported by the record.

specifically a dangerous weapon and that based on his experience as an officer that criminal activity may be afoot.

Commonwealth's Brief at 10-11 (quotation marks and citation omitted).

The Commonwealth's brief does not offer a specific point at which Gibson was seized. Instead, the Commonwealth cites Gibson's failures to respond to the "orders to stop" to support its conclusion that reasonable suspicion of criminal activity was afoot as a basis for Officer Cutter to seize and search Gibson. *See id.* at 10. As noted above, Gibson contends that he was seized as he was leaving Scott's bedroom, when Officer Cutter instructed him to stop. Gibson's Brief at 18.

The validity of the detention must be ascertained at the moment Gibson was seized. "[T]he relevant inquiry is whether an officer possesses reasonable suspicion of criminal activity **before** initiating the detention." *Commonwealth v. Mackey*, 177 A.3d 221, 232 (Pa. Super. 2017) (emphasis in original). We therefore must first determine when Gibson was seized. The trial court implicitly agrees that Gibson was seized when he exited Scott's bedroom:

> When [Gibson] was informed that APO Cutter was going to conduct a search, [Gibson] moved his body away from APO Cutter and made furtive movements with his hands towards the front of his pants. Based on those furtive movements, APO Cutter testified that he was concerned that [Gibson] was concealing a weapon. **As a result, APO Cutter informed [Gibson] that he was not free to leave.**

Trial Court Opinion, 6/13/2024 at 4-5 (emphasis added).

- 17 -

The record is murky concerning the exact sequence of events. According to Officer Cutter's testimony on direct examination, he "sort of tried to stop" Gibson as Gibson attempted to exit Scott's room. N.T., 5/4/2023, at 6. Gibson was able to "push past" Officer Cutter and "attempted to walk back out towards the living room." *Id.* Officer Cutter asked questions, such as, "What's going on? What are you doing here, all this kind of stuff." *Id.* Officer Cutter continued to follow Gibson and "told him he needed to have a seat in the living room." *Id.* On cross-examination, Officer Cutter stated that "when [Gibson] walked out of the room, like he was free to walk out of the room. I told him as he was walking down the hallway ... he was not free to leave." *Id.* at 11.

We conclude that, on the facts presented to the trial court, Gibson was not seized until Officer Cutter physically restrained his movement in the hallway. Under the Fourth Amendment, a show of authority designed to stop a person, but which is not accompanied by the use of physical force, is not a seizure unless the individual actually submits to the show of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("The word 'seizure' .... does not remotely apply, however, to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That

is no seizure.").[9] Gibson did not submit to Officer Cutter's commands. The fact that Officer Cutter may have physically blocked the exit does not appear to matter. *See, e.g., United States v. Smith*, 594 F.3d 530, 539 (6th Cir. 2010) ("Smith did not passively acquiesce or submit to their show of authority but, instead, tried throughout the encounter to push past the officers. Continuing efforts to push past the officers do not constitute submission to a show of authority. Consequently, there was no seizure at this point.").[10] Because he was able to continue to move about the home, Gibson was not detained under the Fourth Amendment until Officer Cutter physically restrained him.

The Commonwealth was required to show that Officer Cutter had reasonable suspicion that criminal activity was afoot when Gibson was physically seized. The essence of *Terry* "is that the totality of the circumstances—the whole picture—must be taken into account. Based upon

_____

[9] Our Supreme Court has rejected *Hodari D.* as inconsistent with Article I, Section 8. *Commonwealth v. Matos*, 672 A.2d 769, 776 (Pa. 1996). Therefore, our analysis would have been different if Gibson raised a claim under Article I, Section 8 of the Pennsylvania Constitution. *See Commonwealth v. Livingstone*, 174 A.3d 609, 621 (Pa. 2017) ("The pivotal inquiry is whether, in light of the facts and circumstances identified above, a reasonable man, innocent of any crime, would have thought (he was being restrained) had he been in the defendant's shoes.") (quotation marks and citation omitted).

[10] We may cite lower federal court decisions for their persuasive authority on federal questions. *See Commonwealth v. Giffin*, 595 A.2d 101, 107 (Pa. Super. 1991).

that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." ***United States v. Cortez***, 449 U.S. 411, 417-18 (1981). That the "whole picture must yield a particularized suspicion" requires "a suspicion that the particular individual … is engaged in wrongdoing." ***Id.***

We cannot agree with the trial court's conclusion that Officer Cutter articulated sufficient facts to establish reasonable suspicion that Gibson was engaged in any kind of wrongdoing. The only objective fact cited by Officer Cutter to suggest any criminality whatsoever was the furtive movements Gibson made towards his pants. Gibson is correct that this does not permit a seizure. ***See Commonwealth v. Moyer***, 954 A.2d 659, 670 (Pa. Super. 2008) ("Furtive movements and nervousness, standing alone, do not support the existence of reasonable suspicion."). This is unlike the agents in ***Mathis***, whose combined observation of a bulge in Mathis' jacket and the odor of marijuana gave rise to a reasonable suspicion that the bulge may have been contraband. ***See Mathis***, 173 A.3d at 715 n.13.

The trial court and the Commonwealth contend that the furtive movements and nervousness are relevant to the core "totality of the circumstances" analysis under ***Terry***. Commonwealth's Brief at 10-11; Trial Court Opinion, 6/1/2023, at 5. In support, the Commonwealth cites ***Commonwealth v. Arrington***, 233 A.3d 910 (Pa. 2020). Commonwealth's Brief at 10. This argument, however, seemingly addresses a different legal

concept. As the Commonwealth does not supply a pinpoint citation or offer any discussion of **Arrington**, we presume it references the following analysis:

> Similarly, we have held that a defendant's "furtive movement of leaning forward and appearing to conceal something under his seat, along with his extreme nervousness and [a] night time stop, was sufficient to warrant a reasonable police officer to believe that his safety was in danger and that [the defendant] might gain immediate control of a weapon." **Buchert**, 68 A.3d at 916-17; **see also Commonwealth v. Simmons**, 17 A.3d 399, 401 (Pa. Super. 2011) (finding reasonable suspicion where the traffic stop was conducted at night, in a high-drug and high-crime area, and the officer witnessed the defendant make the furtive movement of reaching under his seat and then towards his chest, consistent with concealing a weapon); **In re O.J.**, 958 A.2d 561, 566 (Pa. Super. 2008) (finding reasonable suspicion where the traffic stop occurred at night, the defendant initially failed to stop his vehicle when signaled by police, and the defendant made "rapid and furtive hand movements over the [vehicle's] console," which had been left partially opened); **Commonwealth v. Murray**, 936 A.2d 76, 80 (Pa. Super. 2007) (finding reasonable suspicion where the traffic stop occurred at night and in a high-narcotics area, the defendant's vehicle had tinted windows, and the defendant made "a lot of movement in the vehicle" as the officer was approaching).

**Arrington**, 233 A.3d at 916 (footnote omitted).

**Arrington**, and the cases cited therein, all involved a challenge to the lawfulness of the pat-down **search**; in each, the validity of the underlying seizure was either not contested or deemed valid on appeal. **See id.** at 914 (rejecting claim that the officers lacked cause to stop vehicle); **Buchert**, 68 A.3d at 913 (accepting that the "police officers conducted a valid traffic stop" of the car); **Simmons**, 17 A.3d at 403 ("In this matter neither side disputes that the vehicle in question was subject to a valid stop as a result of a brake light violation …."); **In re O.J.**, 958 A.2d at 563 (characterizing the appeal as

- 21 -

involving a "lawful traffic stop"); **Murray**, 936 A.2d at 78 (stating that Murray

argued that "the circumstances of the traffic stop failed to provide the officer

with a reasonable belief that he was dangerous so as to justify a search").

The Commonwealth's argument is thus non-responsive to Gibson's argument

that Officer Cutter lacked reasonable suspicion to believe criminal activity was

afoot so as to justify a seizure.[11]

The probation officers lacked reasonable suspicion that criminal activity

was afoot. Gibson therefore could not be detained on that basis.

### Permissibility of *Terry* Frisk for Officer Safety

We now address whether we may affirm on an alternative basis—

whether, despite the lack of reasonable suspicion of criminal activity, Officer

Cutter's actions were nonetheless lawful based upon a valid safety concern.

---

[11] The Commonwealth briefly suggests that reasonable suspicion of criminal activity was satisfied because of these furtive movements plus the fact that there was a weapon involved. **See** Commonwealth's Brief at 12. The Commonwealth acknowledges that, under **Hicks**, 208 A.3d 916, the mere possession of a weapon does not constitute reasonable suspicion. The analysis is different here, the Commonwealth submits, because the defendant in **Hicks** was not making furtive movements.

The flaw in the Commonwealth's analysis is that it merges the officer safety component of the **Terry** frisk with the separate requirement that there be reasonable suspicion of criminal activity. Setting aside the oddity of the suggestion that **Hicks** would come out the other way if the officers were **unsure** that Hicks possessed a concealed firearm, under **Terry**, an officer cannot manufacture the basis for a frisk by initiating an investigative detention. The officer safety rationale permits a frisk during a valid detention, it does not, however, independently authorize a detention in the first instance.

*See Commonwealth v. Jones*, 193 A.3d 957, 965 (Pa. Super. 2018) (this Court may affirm the decision of the court below on any basis supported by the record). "The rationale behind the 'right for any reason' doctrine is that appellate review is of the judgment or order before the appellate court, rather than any particular reasoning or rationale employed by the lower tribunal." *In re A.J.R.-H.*, 188 A.3d 1157, 1176 (Pa. 2018) (quotation marks and citation omitted). Employing the doctrine is a matter of discretion. *See Commonwealth v. Shaffer*, 209 A.3d 957, 980 (Pa. 2019) (Wecht, J., concurring) ("an appellate court is not bound to utilize [right for any reason] any time it can scour the record and find another basis upon which to affirm"). We opt to address the theory, however, as officer safety concerns predominated throughout this litigation and was the basis for the trial court's decision. *See* N.T., 5/4/2023, at 19 ("[The court]: We're now into the securing the premises to make sure he can do the search safely. And he sees what appears to be furtive movements, and he's trying to make sure he's not at risk, correct?"); Trial Court Opinion, 6/1/2023, at 5 (concluding that an objective officer "would believe that the safety of himself and/or of others was in danger"). The Commonwealth embraced this view. *See* N.T., 5/4/2023, at 21 (Commonwealth arguing, "I believe that under *Commonwealth v. Mathis*, the probation officer does have the right to make sure that he is safe."); Commonwealth's Brief at 12 (arguing that the officers "had a legitimate fear for their safety").

Although not the basis of its decision, the **Mathis** Court flagged this issue:

> Given that the agent possessed reasonable suspicion of both danger and criminality, we need not determine whether, or under what circumstances, a parole agent—who is lawfully inside a private residence, in the performance of official duties, and reasonably concerned about safety—may perform a weapons frisk of a non-parolee, even in the absence of reasonable suspicion of criminality. This issue would be more sharply presented in a case where the suspicion related to danger alone.

**Mathis**, 173 A.3d at 715 n.13. In his **Mathis** dissent, Justice Wecht criticized this theory as incompatible with **Terry**: "Our precedents do not allow us to countenance a weapons frisk by a parole agent of a non-parolee in the absence of reasonable suspicion of criminality. The Majority appears to forget that **Terry** requires a two-step analysis[.]" **Id**. at 723 (Wecht, J., dissenting). The Majority responded at length to that charge:

> Contrary to Justice Wecht's proffer that the two-tiered **Terry** analysis is inviolable, courts have acknowledged that there are circumstances in which protective police actions predicated on **Terry** principles do not require a suspicion of criminality. **See, e.g.**, **Commonwealth v. Narcisse**, 457 Mass. 1, 927 N.E.2d 439, 445 n.6 (2010) ("There are, of course, circumstances other than consensual encounters in which police officers may pat frisk a person in the absence of a reasonable suspicion that the person is (or has been) engaged in criminal activity." (citing, *inter alia*, **Maryland v. Buie**, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)); **see also United States v. Flippin**, 924 F.2d 163, 166 (9th Cir. 1991) ("When the police have lawfully entered a dwelling and have a reasonable suspicion that a suspect is armed, a **Terry** pat down for weapons is permissible."). Indeed, the two United States Supreme Court cases cited in Justice Wecht's dissent relative to this discrete matter, highlight pertinent considerations that may, in the proper situation, support a frisk absent individualized reasonable suspicion of criminality.

In ***Arizona v. Johnson***, 555 U.S. 323 … (2009), for example, the Court effectively waived the requirement of reasonable suspicion of criminality relative to automobile passengers. ***See id***. at 326–27[.]  The Court reasoned as follows:

> [Although], in a lawful traffic stop, there is probable cause to believe that the driver has committed a minor vehicular offense, ... there is no such reason to stop or detain the passengers.  On the other hand ... the risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.

***Id***. at 331–32[] (citations and quotation marks omitted).  Such a rationale could arguably be employed when considering the encounters that occur between non-parolees and parole agents during a home visit, particularly when viewed in reference to the Supreme Court's acknowledgement that in-home confrontations present a particularized danger. ***See, e.g.***, ***Buie***, 494 U.S. at 333[] (explaining that in-home encounters are as, or more, dangerous than on-the-street or roadside confrontations, since the officer is on the adversary's "turf" and in a confined setting of unknown configuration).

***Mathis***, 173 A.3d at 715 n.13 (internal citations omitted).

The ***Mathis*** Majority left open the possibility that a frisk could be permissible when the officer was "reasonably concerned about safety[.]" ***Id.*** We do not interpret this language to encompass a concern about safety as a per se matter every time a probation officer encounters a third party while conducting an authorized search of a probationer.  Indeed, such a holding would be antithetical to the United States Supreme Court's admonishment that categorical exceptions to usual Fourth Amendment standards are strongly disfavored. ***See Bailey v. United States***, 568 U.S. 186, 200 ("Because this exception grants substantial authority to police officers to detain outside of

the traditional rules of the Fourth Amendment, it must be circumscribed."). Moreover, the Commonwealth has not suggested at any point before the trial court or this Court that Officer Cutter would be authorized per se to detain Gibson, nor did the trial court so hold.

We note, however, that a line of case law authorizes police officers serving a search warrant to detain other occupants as a categorical matter. *See Michigan v. Summers*, 452 U.S. 692, 699 (1981) (holding that officers executing a search warrant are authorized to detain the occupants while the search is conducted). This branch of Fourth Amendment law permits intrusions well beyond Officer Cutter's order to sit on the living room couch. *See Muehler v. Mena*, 544 U.S. 93, 98 (2005) (holding that under *Summers* detaining an occupant in the garage with handcuffs for two to three hours during execution of warrant at a known gang house was constitutionally reasonable).[12] In the search warrant context, this exception applies regardless of whether there exists individualized suspicion. *Id.* ("An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.") (quotation marks and citation omitted).

---

[12] At least one jurisdiction has concluded that the *Summers* rationale extends to parole and probation searches. *See State v. Phipps*, 454 P.3d 1084, 1090-91 (Idaho 2019).

Notably, however, the High Court itself has emphasized the significance of the existence of a search warrant in justifying this categorical exception, refusing to extend that analysis to other scenarios. *See, e.g., Maryland v. Buie,* 494 U.S. 325, 334 n.2 (1990) ("In [*Summers*] ... the search warrant implied a judicial determination that police had probable cause to believe that someone in the home was committing a crime."). Our Supreme Court has likewise held that the existence of a warrant is crucial to the *Summers*' categorical exception to the individualized suspicion requirement established by *Terry*. *See Commonwealth v. Rodriquez*, 614 A.2d 1378, 1380-81 (Pa. 1992) (officers acting on a tip opted to search premises without first obtaining a warrant and detained three individuals sitting on the stoop by ordering them inside; "The initial critical distinction between the instant case and *Summers,* is that here the police were not in possession of a valid warrant issued by a neutral and detached magistrate upon a finding of probable cause.").

In *Buie*, the High Court sanctioned the practice of a "protective sweep" of premises as an incident to arrest to protect officer safety, which the Court viewed as an application of *Terry*. In declining to extend *Summers* to that scenario, the *Buie* Court observed that the need to protect officer safety following an arrest was more analogous to its decision in *Ybarra v. Illinois*, 444 U.S. 85 (1979). *Buie*, 494 U.S. at 334 n.2. In *Ybarra*, officers served a search warrant at a tavern for drugs. *Ybarra*, 444 U.S. at 88. Several officers entered and "advised all those present that they were going to conduct

a 'cursory search for weapons.'" *Id.* An officer frisked Ybarra and discovered heroin.

The *Ybarra* Court held that the search was unconstitutional. "Each patron who walked into the [bar] ... was clothed with constitutional protection against an unreasonable search or an unreasonable seizure." *Id.* at 91. The Court rejected the government's argument that a pat down was always permissible for officer safety reasons. "The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." *Id.* at 94.

We find the circumstances of the case at bar to be analogous to *Ybarra*. Here, Gibson happened to be on the premises where an authorized search specific to Scott took place. The *Ybarra* Court implicitly accepted that a *Terry* pat down may be lawful notwithstanding the failure to identity any suspicion of wrongdoing on the third-party's part. We hold that the underlying logic justifying a *Terry* frisk, i.e. that an officer has an interest in protecting his or her safety while carrying out their duties, extends to this scenario. Officers Cutter and Harper were carrying out their duty to supervise Scott. The fact that Gibson was present was incidental to those legitimate duties. In authorizing a frisk in *Terry*, the United States Supreme Court observed that "investigating possibly criminal behavior" is a "legitimate investigative

function," and "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry,* 392 U.S. at 22, 23. Similarly, Officer Cutter was engaged in a legitimate duty when he entered Scott's bedroom. That Gibson was already in that confined space was not a circumstance that Officer Cutter could control. We thus conclude that a *Terry* pat down would be justified in this scenario if Officer Cutter articulated a sufficient basis to believe that Gibson was armed and dangerous. This necessarily calls for an examination of the particular facts.

The case that Officer Cutter reasonably suspected that Gibson was armed and dangerous is far stronger than the proposition that Gibson was engaged in wrongdoing. The Commonwealth's citation to the slew of cases cited in *Arlington* are salient to this inquiry, and the confined quarters in which the initial interaction took place increased the safety concerns. Additionally, Officer Cutter's testimony at the suppression hearing supports the trial court's finding that Gibson suspiciously turned away from Officer Cutter and made movements towards his waist. *Compare Ybarra*, 444 U.S. at 91 (finding that no reasonable suspicion existed to justify a pat down because Ybarra's "hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening"). We thus find that the totality of the circumstances established that Gibson was potentially armed and dangerous, permitting Officer Cutter to conduct a *Terry*

frisk of Gibson, even in the absence of reasonable suspicion that he was engaged in criminal activity.

**Legality of Officer Cutter's Actions**

Our conclusion that Officer Cutter could have lawfully conducted a pat down search is not the end of the matter. A ***Terry*** frisk entails "a limited search of the individual's outer clothing in an attempt to discover the presence of weapons which might be used to endanger the safety of the police officer and others[.]" ***Commonwealth v. Hicks***, 253 A.2d 276, 279 (Pa. 1969). It is justifiable as an intrusion on liberty only to the degree that it goes no further than necessary to promote the safety interest authorizing the search. ***Commonwealth. v. E.M.***, 735 A.2d 654, 659 (Pa. 1999) ("Such a frisk … must always be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.") (citation omitted).

Here, the record reflects that instead of informing Gibson that he needed to conduct a pat down, or even restrain him for that limited purpose, Officer Cutter allowed Gibson to exit Scott's bedroom, ordering him to the living room. ***See*** N.T., 5/4/2023, at 6. Thereafter, when Gibson "started making his way towards the bathroom," he "grabbed a hold of both of his wrists and told him … he needed to have a seat in the living room." ***Id.*** At no point did Officer Cutter make any attempt to pat down Gibson's outer clothing to ensure he was unarmed.

Forcing Gibson to sit in a room against his will does nothing to dispel concerns that Gibson was, in fact, armed; it simply intrudes on Gibson's freedom to leave the premises and not engage the officers. We are highly sensitive to officer safety concerns, but we must also be sensitive to Gibson's own privacy interests, as defined by the legal precedent discussed above. As far as the record shows, Gibson would have had to sit in the living room until the officers let him leave. This intrusion on his liberty, akin to the categorical exception announced in **Summers**, cannot be justified under these circumstances.

### Conclusion

As the rationale of **Terry** supplies the basis for the search conducted in the case at bar, its limitations also apply. The "sole justification of the search ... is the protection of the police officer ... and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." **Terry**, 392 U.S. at 29. Indeed, the companion case to **Terry**, **Sibron v. New York**, 392 U.S. 40 (1968), held that even if the officer had a justification to search for weapons, the search employed exceeded what was allowed. **See id.** at 65 ("Patrolman Martin thrust his hand into Sibron's pocket .... [t]he search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man."). The same reasoning applies here.

- 31 -

Officer Cutter's actions did not further the goal of disarming Gibson, and we thus decline to affirm on this alternative basis. The trial court therefore erred in denying suppression.

Order denying suppression reversed. Judgment of sentence vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 03/19/2025